STATE OF MARYLAND ET AL. *v.*
LUNDQUIST ETC.

[No. 340, September Term, 1970.]

*Decided June 14, 1971.*

The cause was argued on February 8, 1971, before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ., and reargued on March 1, 1971, before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

Argued and reargued by *Francis X. Pugh, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellants.

Argued and reargued by *James J. Hanks, Jr.,* and *George Cochran Doub* for appellee.

DIGGES, J., delivered the opinion of the Court. SMITH, J., concurs and filed a concurring opinion at page 556 *infra.* BARNES, J., dissents and filed a dissenting opinion at page 558 *infra.*

More than a quarter of a century has passed since June 14—Flag Day—1943, when the Supreme Court ruled in *West Virginia State Board of Education v. Barnette,* 319 U. S. 624, that a state may not compel unwilling school children to salute and pledge allegiance to the flag of the United States. On September 18, 1970 the Circuit Court for Anne Arundel County (Evans, J.) issued a declaratory decree invalidating the key provisions of the recently enacted "Flag Salute" statute, Chapter 737, Laws of Maryland 1970,[1] as violative of the First

---

1. Now codified as Art. 77, § 77, Md. Code (1957, 1969 Repl. Vol., 1970 Cum. Supp.) Ch. 737 provides:

"It shall be the duty of the board of education of each and every county in the State of Maryland, and of the Board of Education for Baltimore City, in the State of Maryland, to cause to have displayed a flag of the United States of America upon every public school building within their respective jurisdictions while said schools are in session, and to that end shall make all necessary purchase of flags, staffs and appliances therefor and establish rules and regulations for the proper custody, care and display of the flag in said schools; and it shall be the duty of said boards of education to provide each classroom with an American flag; to prepare for each classroom at the

536

Amendment (applicable to the states through the Fourteenth Amendment) of the Federal Constitution which provides: "Congress shall make no law . . . abridging the freedom of speech." Basing his decision squarely on the holding in *Barnette,* Judge Evans enjoined the appellants, the State of Maryland and the Anne Arundel County Board of Education, from enforcing the quotidian schoolroom requirement that all students and teachers, except those who object for "religious reasons," must stand, salute the flag and recite in unison the pledge of allegiance. He also prohibited enforcement of the disciplinary provision of Ch. 737 which directed that any person "who may commit an act of disrespect, either by word or action, shall be considered to be in violation of the intent of this act." Agreeing with the trial judge that *Barnette* fully controls the case before us we shall affirm the decree.

---

beginning of each day of classes in all public schools of the State a program providing for the salute to the flag and other patriotic exercises approved by the United States Government; and to require all students and teachers in charge to stand and face the flag and while so standing render an approved salute, and recite in unison the pledge of allegiance as follows: 'I pledge allegiance to the flag of the United States of America and to the Republic for which it stands; one nation under God, indivisible, with liberty and justice for all'. Any pupil or teacher, for religious reasons, may be excused from actually repeating the words of the pledge of allegiance and from giving any form of hand salute. Any person, however, who may commit an act of disrespect, either by word or action, shall be considered to be in violation of the intent of this act. The said boards of education may provide such other patriotic exercises from time to time as may be deemed by them to be expedient, and under such regulations and instruction as may best meet the various requirements of the different grades in such schools; all to the end that the love of liberty and democracy, signified in the devotion of all true and patriotic Americans to their flag and to their country, shall be instilled in the hearts and minds of the youth of America.

"Sec. 2. *And be it further enacted,* That this Act is hereby declared to be an emergency measure and necessary for the immediate preservation of the public health and safety and having been passed by a yea and nay vote supported by three-fifths of all the members elected to each of the two houses of the General Assembly, the same shall take effect from the date of its passage."

The oath of loyalty is no recent phenomenon in Western civilization. Described as a potent social bond in classical Greek and Roman society, and mentioned as a pledge of fealty to the king in feudal times, it had become deeply embedded in the common law of England long before its importation to America. See, Maitland, *The Constitutional History of England,* 364-66 (1931) and other authorities noted by Chief Justice Vanderbilt in *Imbrie v. Marsh,* 3 N. J. 578, 71 A. 2d 352, 18 A.L.R.2d 241 (1950), *aff'g,* 5 N.J.Super. 239, 68 A. 2d 761 (1949). Oaths to uphold the United States Constitution are required of all our executive, legislative and judicial officeholders on both the state and national levels by Art. II, § 1 and Art. VI of that document itself, and oaths requiring claims of loyalty or disclaimers of subversive intent by teachers; civil servants and a multitude of citizens have been the subject of endless judicial review. In determining the validity of oaths, courts have inquired into the narrowness with which they are drawn, the specific governmental interest they are designed to protect and their effect on free speech as well as due process rights. See generally *Whitehill v. Elkins,* 389 U. S. 54 (1967) and Annot. thereto contained in 19 L.Ed.2d 1333 (1968); Note, *Loyalty Oaths,* 77 YaleL.J. 739 (1968); Annot. *Imbrie v. Marsh, supra,* contained in 18 A.L.R.2d 268 (1951) and extensive later case service to date. Thus, as recently as February 1971 the United States Supreme Court upheld an oath of loyalty to the Constitution required by the rules for admission to the New York Bar as sufficiently narrow in scope, directly related to the important governmental interest of regulating the legal profession and not employed in such a manner as to penalize political beliefs. *Law Students Civil Rights Research Council v. Wadmond,* 401 U. S. 154, 161-64 (1971).

As a peculiar sub-species of loyalty oaths, the pledge of allegiance to the flag was not conceived until 1892, but then only as a voluntary and recommended patriotic exercise for the quadricentennial celebration of Columbus

Day. New York was the first state to make the pledge of allegiance an obligatory requirement of education law in 1898, one day after the Spanish-American War began. Although other states quickly followed suit by enacting similar or identical statutes, it was not until World War I that Maryland made the pledge of allegiance a required schoolroom exercise. Ch. 75, Laws of 1918. *See*, Weig and Appleman, *The History of the United States Flag*, *passim* (1961). These statutes were to become the target of considerable litigation, but over the strident religious objections of the Jehovah's Witnesses during the 1930's the mandatory salute was upheld in a series of cases in state and federal courts, all culminating in *Minersville School District v. Gobitis*, 310 U. S. 586 (1940).[2] Only three years later the Supreme Court abruptly reversed this holding in *West Virginia State Board of Education*

---

2. The Supreme Court thus reversed *Minersville School Dist. v. Gobitis*, 108 F. 2d 683 (3d Cir. 1939), *aff'g*, 24 F. Supp. 271 (E. D. Pa. 1938), opinion at 21 F. Supp. 581 (1937). Other flag salute cases were *Gabrielli v. Knickerbocker*, 306 U. S. 621 (1939), *denying cert. and dismissing appeal from* 12 Cal. 2d 85, 82 P. 2d 391 (1938), *rev'g*, 74 P. 2d 290 (Cal. App. 1937); *Johnson v. Deerfield*, 306 U. S. 621 *aff'g per curiam* 25 F. Supp. 918 (D. Mass. 1939) (three judge Dist. Ct.); *Hering v. State Board of Education*, 303 U. S. 624 (1938) *dismissing appeal from* 118 N.J.L. 566, 194 A. 177, *aff'g per curiam* 117 N.J.L. 455, 189 A. 629 (1937); *Leoles v. Landers*, 302 U. S. 656, *dismissing appeal for want of substantial federal question from* 184 Ga. 580, 192 S. E. 218 (1937); *State ex rel. Bleich v. Board of Public Instruction*, 139 Fla. 43, 190 So. 815 (1939); *Nicholls v. Lynn*, 297 Mass. 65, 7 N.E.2d 577 (1937); *People ex rel. Fish v. Sandstrom*, 279 N. Y. 523, 18 N.E.2d 840 (1939), *rev'g*, 167 Misc. 436, 3 N.Y.S.2d 1006 (1938); *Shinn v. Barrow*, 121 S.W.2d 450 (Tex. Civ. App. 1938); *Reynolds v. Rayborn*, 116 S.W.2d 836 (Tex. Civ. App. 1938). In Maryland the flag salute controversy never reached the Court of Appeals, although it erupted with some force at an Oxon Hill school in Prince George's County. In September 1936 the six children of August Ludke, all Jehovah's Witnesses, were expelled for refusing to salute the flag. The Attorney General ruled that the State Board of Education had no authority to decide the constitutional question involved. 21 Op. Atty. Gen. 560 (1936). The Ludkes brought a mandamus action to compel re-admission, but were unsuccessful and did not appeal. No. 11 at Law, Petitions, October Term 1936, Circuit Court for Prince George's County, Md. Of passing interest, the Board of Education's minutes from the period reveal that Ogle Marbury, later Chief Judge of this Court, served as successful counsel for the Board in the mandamus action. Of equal interest, William L. Henderson, who also became Chief Judge of this Court, was the assistant attorney general who penned the opinion mentioned above.

*v. Barnette, supra.* The Maryland pledge of allegiance statute, most recently codified as § 77 of Art. 77, Code (1957, 1969 Repl. Vol.), remained unchanged until it was repealed and re-enacted by Ch. 737 of the Laws of 1970.

The plaintiffs who have challenged the new statute in their own behalf and in behalf of others similarly situated are August Luther Lundquist and his son Eric. The father teaches social sciences at Brooklyn Park High School and his fifteen year old son attends Andover High School. Both schools are located in the Baltimore metropolitan area just within the boundaries of Anne Arundel County. At the hearing before Judge Evans only Mr. Lundquist appeared as a witness. His testimony consisted of a statement read into the record (see appendix) and cross-examination. He claimed that he would refuse to engage in a mandatory flag salute ceremony, not for religious reasons but because he could not "in good conscience" force patriotism upon his classes. He voluntarily if not eagerly instructed his world history classes in patriotic and democratic ideals and he had no objection to teaching courses, such as civics, which made instruction in democracy a required part of the curriculum. Mr. Lundquist also objected strongly to being forced to salute the flag because be believed such a requirement eliminated his right to freely express his own loyalty to the United States. He indicated, without objection, that his son shared these views and would similarly refuse to engage in the flag salute.

Judge Evans determined that under the Uniform Declaratory Judgment Act, Art. 31A, § 16, Code (1957, 1971 Repl. Vol.) both the teacher's and the student's First Amendment rights were affected by the statute and they possessed requisite standing to challenge Ch. 737. The Attorney General has not questioned this ruling on appeal. Although the new act has no explicit provision outlining the consequences for refusing to salute the flag, it is quite clear that such recalcitrant students and teach-

ers can be disciplined under other sections of the public education laws, specifically §§ 75 and 114, Art. 77 (Code 1957, 1969 Repl. Vol.). Finally, if there should be any doubt about the immediacy of the threat to the appellants, aside from the obvious chilling effect on their First Amendment rights, see *Dombrowski v. Pfister*, 380 U. S. 479, 486-87 (1965), the Attorney General has admitted in the answer to the Lundquists' amended complaint that a program of enforcement is in preparation and awaits only the outcome of this case. See *Grimm v. Co. Comm'rs of Wash. Co.*, 252 Md. 626, 632-33, 250 A. 2d 866 (1969) ; *compare Hitchcock v. Kloman*, 196 Md. 351, 355-56, 76 A. 2d 582 (1950) ; *cf. Bruce v. Director, Dept. of Chesapeake Bay Affairs*, 261 Md. 585, 276 A. 2d 200 (1971).

The Attorney General claims that *Barnette* was decided on religious grounds, and since Ch. 737 provides for a religious exemption, the constitutionality of this act is not controlled by *Barnette*. Rejecting this contention, Judge Evans' very thoughtful memorandum opinion rested on the assumption that *Barnette* was decided primarily on freedom of speech grounds and was therefore completely controlling. To support this conclusion he relied on Justice Harlan's statement for the Court in *Street v. New York*, 394 U. S. 576, 593 (1969) :

> ". . . [i]n Board of Educ. v. Barnette . . . this court held that to require unwilling school children to salute the flag would violate *rights of free expression* assured by the Fourteenth Amendment.
> (Emphasis added.)

The Attorney General claims that this is gratuitous dictum and offers the following explanation, as we understand it from his brief and his oral argument, to demonstrate why *Barnette* does not control this case :

He first asserts it has been traditionally understood

that *Barnette* was decided on religious grounds, having been cited as a freedom of religion precedent in *Frain v. Baron*, 307 F. Supp. 27 (E. D. N. Y. 1969) and *Lewis v. Allen*, 5 Misc. 2d 68, 159 N.Y.S.2d 807, *aff'd*, 11 A.D.2d 447, 207 N.Y.S.2d 862 (1960), though he may well have added *Prince v. Massachusetts*, 321 U. S. 158, 165-66 (1944). Moreover, *Barnette* affirmed an injunction granted at the instance of religious plaintiffs and "those similarly situated" who sought to be relieved from a requirement to salute the flag on the grounds that it violated their religious beliefs. He further argues that the main function of the opinion was to overrule *Gobitis*— which rejected an identical religious claim on religious grounds. While conceding that some of the eloquence in Justice Jackson's opinion for the majority "suggests an involvement of freedom of speech," the Attorney General contends we cannot ignore the background of that opinion and the voting pattern of the Court. He points to Justice Frankfurter's dissenting opinion which focused in large part on religious issues and to the separate brief dissent of Justices Roberts and Reed who voted for reversal on the basis of the views expressed in *Gobitis*. He has also referred us to the joint concurring opinion by Justices Black and Douglas in which they state they "are substantially in agreement" with the majority's reasoning but then go on to discuss the free exercise of religion clause. Finally, he notes that Justice Murphy's separate concurring opinion also devoted some discussion to the freedom of worship.

On the basis of this analysis the Attorney General would have us conclude that even if Chief Justice Stone and Justice Rutledge actively favored the purported free speech rationale of the majority opinion by Justice Jackson, the six other members of the Court (three dissenting —three concurring) viewed the decisional issue as freedom of religion. To resolve the questions raised by this suggested interpolation of the Court's vote and the result of its action in *Barnette* we must examine not only

the opinion itself but also the constitutional and historical setting in which it was decided.

## FROM GOBITIS TO BARNETTE

Instead of settling the flag salute controversy, the decision in *Minersville School District v. Gobitis, supra,* only precipitated a disagreement among the justices on the Supreme Court and exacerbated a growing conflict over the question throughout the country. The eight to one majority ruling that upheld the expulsion of Jehovah's Witnesses schoolchildren for refusing to salute the flag was to become a three to six minority view within three years. During the same period the Witnesses became the butt of an increasing wave of violent persecution as well as discriminatory legal prosecution until their deliverance in *Barnette* and a series of First Amendment cases in which the Supreme Court upheld their right to practice and preach their religion.

The major legal precedent which had blocked the Jehovah's Witnesses was a constitutional doctrine known as the secular regulation rule. Although this rule was to be completely ignored in the *Barnette* majority opinion, the Attorney General is correct in asserting that it received attention in the concurring and dissenting opinions there. The rule also served as the constitutional point of embarkation for Justice Frankfurter's discursive analysis of the flag salute requirement in *Gobitis*. After observing that the First Amendment, as an historical concept, gave complete protection to religious beliefs, Justice Frankfurter reasoned that religious liberty was not absolute when it collided with the legitimate secular concerns of society.

> "The religious liberty which the Constitution protects has never excluded legislation of general scope not directed against doctrinal loyalties of particular sects. Judicial nullification of legislation cannot be justified by attributing to the framers of the Bill of Rights views for

which there is no historic warrant. Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities." 310 U. S. at 594-95.

Having established this principle, he concluded that the societal goal of the pledge was the "promotion of national cohesion. . . . an interest inferior to none in the hierarchy of legal values." "National unity," he wrote, "is the basis of national security." While "some specific need or interest of secular society," such as health, defenses or taxes might fall before the demands of First Amendment freedoms, national unity was a transcendant overriding interest before which sentiments to the contrary must give way. Pursuing this reasoning, Justice Frankfurter offered a complete justification for the flag salute:

"The ultimate foundation of a free society is the binding tie of cohesive sentiment. Such a sentiment is fostered by all those agencies of the mind and spirit which may serve to gather up the traditions of a people, transmit them from generation to generation, and thereby create that continuity of a treasured common life which constitutes a civilization. 'We live by symbols.' The flag is the symbol of our national unity, transcending all internal differences, however large, within the framework of the Constitution." *Id.* 596.

The only question left unanswered then was whether the state's selection of the flag salute to achieve national

unity had some rational basis. To resolve this problem
Justice Frankfurter devoted the balance of the opinion to
establishing the doctrine of judicial restraint in the field
of education law:

> "the courtroom is not the arena for debating is-
> sues of education poiicy. It is not our province to
> choose among competing considerations in the
> subtle process of securing effective loyalty to the
> traditional ideals of democracy, while respecting
> at the same time individual idiosyncracies
> among a people so diversified in racial origins
> and religious allegiancies. So to hold would in
> effect make us the school board for the country.
> That authority has not been given to this Court,
> nor should we assume it." *Id.* 598.

He then made the decisive assumption that a flag salute
could be required of non-objecting students and reasoned
that it would be an unwarranted obstruction of valid leg-
islative judgment for the judiciary to grant exceptional
immunity to dissidents:

> "such an exemption might introduce elements of
> difficulty into the school discipline, might cast
> doubts in the minds of the other children which
> would themselves weaken the effect of the exer-
> cise." *Id.* 600.

The opinion terminated with a final analysis of the de-
sirability of judicial restraint and the need to let the
representatives of the people take the primary role in de-
fending personal liberties. "To fight out the wise use of
legislative authority in the forum of public opinion and
before legislative assemblies rather than to transfer such
a contest to the judicial arena, serves to vindicate the self-
confidence of a free people." *Id.* It would be improper for
the Court to interfere with the democratic process by de-
claring the expulsion of the Gobitis children unconstitu-
tional.

Justice McReynolds merely concurred in this result with only Chief Justice Stone dissenting in a vigorous defense of First Amendment freedoms. The Chief Justice's most telling point was that the freedoms of religion and speech presuppose an even more basic constitutional value: "freedom of the human mind and spirit," which no balancing test could ever diminish and which "must be deemed to withhold from the state any authority to compel belief or the expression of it . . . ." *Id.* 604. *See United States v. Carolene Products Co.*, 304 U. S. 144, 152-53, n. 4 (1938) (Stone, C. J.).

The reaction to the decision in *Gobitis* has been exhaustively documented and analyzed by David Manwaring in *Render Unto Caesar* (Univ. Chicago Press 1962). A broadstroke sketch based on his five years of research into the entire flag salute controversy should suffice to understand the circumstances leading up to *Barnette.* Following the decision a veritable wave of mob violence, spurred on in large part by the public's apprehension over our impending involvement in World War II, was brought down upon the seemingly unpatriotic Witnesses.[3] Legal prosecutions also followed, in some instances on charges of flag desecration and even sedition, but for the most part hundreds of arrests for violations of local ordinances which prohibited door to door canvassing or which required a license tax for peddling their religious literature.

Scholarly reaction to the opinion also reached a high pitch, mostly critical of the Court. *See, e.g.,* Corwin, *The Constitution and What it Means Today,* 199 (1941) ; Rotnem and Folson, *Recent Restrictions Upon Religious Liberty,* 36 Am. Pol. Sci. Rev. 1053, 1063-64 (1942) ; Note, 26 Cornell L.Q. 127 (1940) and twenty-nine other comments that openly or tacitly questioned the reasoning or the result of the case, collected in Manwaring, *Render Unto Caesar,* 149. Many of the articles appear to contain

---

3. Manwaring has documented such incidents in many states, including Maryland, where a mob broke up a Witness meeting in Rockville on June 19, 1940, only sixteen days after *Gobitis* was announced. *Render Unto Caesar,* 166 and 293, n. 25.

misconceptions about the complex holding, even those that looked with favor upon it, see, e.g., 14 Temple L.Q. 545 (1940). But in all fairness it should be noted that the rhetorical overtones and effect of the opinion were bound to subject it to bitter criticism for allowing national unity to override religious liberty, especially in the name of judicial self-restraint.

The tide of opinion on the Supreme Court was changing also, but not before reaching its lowest ebb in *Jones v. Opelika*, 316 U. S. 584 (1942), which upheld a statute frequently used against the zealous street preachers: the peddler's license tax. Justice Reed, who wrote the majority opinion, had little difficulty resolving this challenge to a town's right to promulgate non-discriminatory secular regulations over the use of its streets. In spite of the fact that he explicitly disclaimed any reliance on the *Gobitis* opinion, 316 U. S. at 598, Justices Black, Murphy and Douglas dissented along with Chief Justice Stone and in a brief separate dissent openly repudiated their adherence to *Gobitis. Id.* 623-24. Immediately after Justice Rutledge took his seat on the Court on February 15, 1943, the decision to grant a rehearing in *Jones v. Opelika* was announced. 318 U. S. 796-97. *See Journal of the Supreme Court,* October 1942 Term, 153, order at 157. (N.B., 87 L. Ed. 1161 erroneously lists Feb. 14 as the date of the order.)

On May 3, 1943 the Court announced its decision in *Murdock v. Pennsylvania,* 319 U. S. 105, *Martin v. Struthers,* 319 U. S. 141 and *Douglas v. Jeannette,* 319 U. S. 157—all Jehovah's Witnesses cases—which struck down the peddler's license tax, invalidated an anti-doorbell ringing ordinance, and basically ruled as moot a federal injunction against these now unconstitutional statutes. In the same breath (319 U. S. 103) it reversed the holding in *Jones v. Opelika.* While relying heavily on a freedom of speech rationale in these decisions, the majority opinions effectively crippled the strict secular regulation rule. Justice Jackson, in a separate opinion ap-

pended to these three cases, extensively reviewed and strongly condemned the offensive preaching tactics of the Witnesses, 319 U. S. at 167-74. In a comment which seemingly favored the continued application of the secular regulation rule, he referred to the new majority's analysis of First Amendment freedoms as "a vague but fervent transcendentalism," *id.* 179, which *in effect gave a religious sect the privilege of invading the privacy of others*. *Id.* 181. Since *Barnette* was argued on the same day as these secular regulation decisions, it strikes us as improbable that Justice Jackson's dissenting views recommended him as the majority opinion writer for yet another secular regulation case. Nevertheless he was the author of the Court's elaborate overruling of *Gobitis*. Admittedly, another member of the new majority in *Jones v. Opelika* and related cases could have overturned the required flag salute on the basis of the rationale newly articulated there, but without Justice Jackson's support. Their failure to take such a course strongly suggests the Attorney General's analysis of the Court's vote is incorrect.

In writing the opinion for the Court, Justice Jackson addressed a more fundamental issue than that posed by the religiously motivated plaintiffs or framed by the *Gobitis* opinion. He meticulously pointed out that the case did not

> "turn on one's possession of particular religious views or the sincerity with which they are held. While religion supplies appellees' motive for enduring the discomforts of making the issue in this case, many citizens who do not share these religious views hold such a compulsory rite to infringe constitutional liberty of the individual. [Footnote with extensive list of scholarly articles opposing the pledge of allegiance omitted.] It is not necessary to inquire whether nonconformist beliefs will exempt from the duty to sa-

lute unless we first find power to make the salute a legal duty.

"The *Gobitis* decision, however, *assumed,* as did the argument in that case and in this, that power exists in the State to impose the flag salute discipline upon school children in general." [Emphasis in the original.] *West Virginia State Bd. of Edu. v. Barnette, supra,* 319 U. S. at 634-35.

Having avoided a confrontation with the secular regulation rule, the Court re-examined and rejected the remaining bases of the *Gobitis* decision. The Court first set out to answer Justice Frankfurter's rather strong promotion of national cohesion as an end in itself and indicated that the strength needed for national self-preservation could not be the only standard for resolving challenges against the authority of the state. If this were the case, then governmental interests would always predominate over individual liberties. The whole point of the Bill of Rights, the opinion reasoned, was to limit the inexorable power of the state, and without it there is doubt if the Constitution would have ever been ratified. 319 U. S. at 636-37. Indeed, enforcement of the First Amendment, rather than a source of debilitation, should be viewed as "a means of strength to individual freedom of mind in preference to officially disciplined uniformity. . . ." *Id.* 637. To carry this reasoning to its logical conclusion the Court elaborated on the need for political neutrality in the public schools.

"Free public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction. If it is to impose any ideological discipline, however, each party or denomination must seek to control, or failing that, to weaken the influence of the educational system. Observance of the limitations of the Constitu-

tion will not weaken government in the field appropriate for its exercise." *Id.*

Disclaiming any pretense to act as the "school board for the country," the Court was quick to vindicate the extensive discretionary powers of the local boards of education. Nevertheless, as state agencies bound by the Fourteenth Amendment, their functions were circumscribed by the Bill of Rights. *Id.* As for Justice Frankfurter's suggestion that the Court had no "controlling competence" over an issue more appropriately committed to the wisdom of legislative assemblies, the Court interposed this trenchant answer:

> "The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *Id.* 638.

Under the Fourteenth Amendment some "rational basis" might well serve to regulate a public utility within the bounds of due process,

> "[b]ut freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect." *Id.* 639.

Even heavier constitutional artillery was reserved for the closing pages of the majority opinion—in language which completely refutes the Attorney General's contention that *Barnette* merely "suggests an involvement of

free speech." The section begins with a withering attack on the critical assumption made in *Gobitis* that "national unity is the basis of a national security" for which the authorities have "the right to select appropriate means for its attainment." *Id.* 640. Accepting national unity as a legitimate end to be fostered by persuasion and example, the Court questioned the compulsory flag salute as a constitutionally permissible means to achieve that goal.

"Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. . . .

"It seems trite but necessary to say that the First Amendment to our Constitution was designed to avoid these ends by avoiding these beginnings. There is no mysticism in the American concept of the State or of the nature or origin of its authority. We set up government by consent of the governed, and the Bill of Rights denies those in power any legal opportunity to coerce that consent. Authority here is to be controlled by public opinion, not public opinion by authority.

"The case is made difficult not because the principles of its decision are obscure but because the flag involved is our own. Nevertheless, we apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization. To believe that patriotism will not flourish if patriotic ceremonies are voluntary and spontaneous instead of a compulsory routine is to make an unflattering estimate of the appeal of our institutions to free minds. We can have intellectual individualism and the rich cultural diversities that we owe to

exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." 319 U. S. at 641-42.

In a joint concurring opinion Justices Black and Douglas stated, "[w]e are substantially in agreement with the opinion just read." While they then proceeded to discuss their "change of view" since *Gobitis* concerning the secular regulation rule, we fail to see how this supplementary religious liberty note to the majority's free speech rationale diminishes their affirmative acceptance of the opinion itself and not merely the result. *Id.* 643-44. Justice Murphy's concurring opinion was even more explicit, for he unequivocally stated, "I agree with the opinion of the Court and join in it." *Id.* 644. He too placed more emphasis on the religious issues than did the majority opinion and he toned down some of its rhetoric. Unlike Justices Black and Douglas and more in the tradition of the *Gobitis* dissent, he linked the freedom of religion with the freedoms of thought and speech, pointing out that these constitutional guaranties include "both the right to speak freely and the right to refrain from speaking at all, except insofar as essential operations of government may require it for the preservation of an orderly society, —as in the use of compulsion to give evidence in court." *Id.* 645. The flag salute did not reach this level of re-

quired essential conduct. Contrary to the Attorney General's intimations we think that none of these members of the Court rejected the free speech resolution of the flag salute controversy, though they may have added varying pleas for religious freedom to the discussion.

Justice Frankfurter's long dissenting opinion reemphasized and expanded his stringent views on religious liberty and the absolute need for judicial restraint. *Id.* 646-71. It would serve no useful purpose to repeat his very personal restatement of the principles set forth in *Gobitis*. Neither Justice Reed nor Roberts adopted this dissent, choosing instead to vote for reversal on the basis of their continued adherence to the *Gobitis* opinion. *Id.* 642-43. Whether their cryptically brief dissent was based on stare decisis or a rejection of the views expressed by the Court is a matter of speculation. We do know, however, that on the same day *Barnette* was handed down Justice Roberts announced the Court's unanimous decision in *Taylor v. Mississippi,* 319 U. S. 583 (1943), reversing the convictions of a number of Jehovah's Witnesses for teaching "resistance to governmental compulsion to salute" the flag. Viewing the whole problem as a matter of a fortiori reasoning, completely controlled by *Barnette,* the Court ruled that if the state cannot compel someone to salute the national emblem, "then certainly it cannot punish him for imparting his views on the subject to his fellows and exhorting them to accept those views." 319 U. S. at 589.

*Barnette* and *Taylor* thus closed a stormy chapter in the history of the Bill of Rights. No doubt a smaller majority of the Supreme Court at the time could have limited the former opinion simply to interpreting the Free Exercise of Religion Clause of the Constitution, but the fact remains they did not do so. In our view *Barnette* was unequivocally decided as a question of free speech under the First Amendment; it is binding as such on this Court.

## BEYOND BARNETTE

The most significant case since *Barnette* involving the free speech rights of students under the First Amendment is *Tinker v. Des Moines Community School Dist.*, 393 U. S. 503 (1969). In that opinion the Supreme Court concluded the silent wearing of black armbands in class to protest the Vietnam war could not be proscribed by school regulations, "at least if it could not be justified by a showing that the students' activities would materially and substantially disrupt the work and discipline of the school." 393 U. S. at 513. Recent flag salute and related cases have turned on this last distinction.

In *Banks v. Bd. of Public Instruction*, 314 F. Supp. 285 (S. D. Fla. 1970) a three judge district court reviewed a Florida flag salute school regulation which provided an exemption for both religious and conscientious objectors but nevertheless required those children to stand while the rest of the class recited the pledge of allegiance. The panel ruled, on the basis of *Barnette* and *Tinker,* that an objecting student could not be expelled or disciplined for his conduct, but it was careful to say, "the unrefuted testimony clearly reflects that the plaintiff's refusal to stand has not caused any disruption in the educational process." 314 F. Supp. at 295.[4] In contrast, the United States District Court for the Eastern District of New York dismissed a bill of complaint for an injunction brought by a school child who refused to stand or leave the room during the recitation of the pledge of allegiance. *Richards v. Bd. of Edu. Union Free School Dist. # 17,* No. 70-C-625, decided July 10, 1970. The court specifically found that the child's conduct had caused some minor disruption and thus ruled that the case fell within the factual exception to the *Tinker* rationale. *Hanover v. Northrup,* U. S. Dist. Ct. Conn., 325 F. Supp. 170, decided May 1, 1970 and *Frain v. Baron,* 307 F. Supp. 27

---

4. On direct appeal to the Supreme Court that judgment was vacated and the case remanded for possible appeal to the 5th Circuit Court of Appeals. 401 U.S. 988, 91 S. Ct. 1223, 28 L.Ed.2d 526 (decided March 29, 1971).

(E. D. N. Y. 1969) declined in accordance with *Barnette* to coerce unwilling school children or teachers into saluting the flag but analyzed the problem before them in terms of the *Tinker* decision. *See also Sheldon v. Fannin,* 221 F. Supp. 766 (D. Ariz. 1963) which allowed children to remain seated during the playing of the national anthem. *But Compare Caldwell v. Craighead,* 432 F. 2d 213 (6th Cir. 1970), *cert. denied,* 402 U. S. 953 (1971).

The *Tinker* decision is a direct descendant of *Barnette*. It specifically relies on the latter case, using it to demonstrate that neither "students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." 393 U. S. at 506. While the Court in *Tinker* affirmed "the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools," *id.* 507, the initial safeguard it recognized in this area was that a "student in public school may not be compelled to salute the flag," citing only *West Virginia v. Barnette* for this proposition. *Id.* Entertaining no doubt that there is ample authority to punish students or teachers who materially disrupt proper school activities, including voluntary patriotic programs, we are far from convinced that the mere refusal to participate in any phase of the pledge of allegiance ritual is punishable. To reach a contrary conclusion would allow the schools to discipline such refusal as "an act of disrespect," even though they may not compel this ceremony in the first place. As the disciplinary provision of Ch. 737 seems to permit this untenable result it too must fall with the general salute requirement.

The posture in which this case comes before us raises no factual issue of potential or actual disruption. We recognize, as did Justice Frankfurter in the *Gobitis* opinion, that one student's failure to join in this group expression "might introduce elements of difficulty into the school discipline, might cast doubts in the minds of the other children which would themselves weaken the

effect of the exercise." 310 U. S. at 600. As if in direct response to this assertion, the Court in *Tinker* has answered: "our Constitution says we must take this risk . . . ." 393 U. S. at 508. Quite aside from the fact that *Barnette* and *Tinker* are binding constitutional precedents, we also are convinced the First and Fourteenth Amendments of the Constitution require this gamble. The salute requirement and punishment provision of Ch. 737 of the Laws of Maryland 1970 are unconstitutional and void.

*Decree affirmed. Appellants to pay the costs.*

## APPENDIX

## STATEMENT OF BELIEF BY AUGUST L. LUNDQUIST

Since the enactment of the statute requiring a flag salute of certain teachers and students I have done much soul searching as to why I feel that I cannot comply with the law. In doing so I must say that I have always been a loyal citizen of this great country, and under any circumstances, will always be one.

In 1944, while still a senior in high school, I enlisted in the U. S. Navy and served honorably for two years. Shortly after discharge I became a member of the active Naval Reserve program and have continued in the reserves to this time. On my own initiative, during the Korean conflict, I returned to active duty for a period of a year and a half.

As a boy and again as an adult with sons of my own I have been active in the Boy Scout movement, a significant part of which is practicing a serious duty to God and Country. The flag salute and other forms of flag courtesy are an integral part of the scouting program.

As a teacher and more specifically as a social studies teacher, it is my purpose to teach all students about the

democratic principles which make this country great. This country is great because it rests on the individual and his faith in his country with its principles of democracy. This country will remain great as long as the individual citizen, by his own conviction, continues to develop his love of country in his own way and to be encouraged to express this love in those ways which seem most appropriate to the individual.

Now I am confronted with an edict that I must not only perform an act daily but I must force others to do the same act or be in fear of the law. This I cannot in good conscience do. To force patriotism down on anyone is extremely repulsive to me; and ultimately an act of futility for patriotism is something you feel, something you believe, something you do as you are a part of your country, but it is something that cannot be forced. I cannot teach democracy one minute and dictate a special form of ceremony the next and be true to myself or my students.

I suppose what I would like to say would be that my conscience will not allow me to be forced or to force others to do acts which must come from the heart.

I love my country, I respect my flag and other symbols of my country, but I am repulsed by the idea that this should be forced on anyone. I cannot in good conscience do it.

SMITH, J., concurring:

Most reluctantly, I concur. I say reluctantly because I see the possibility of very real problems from extensions of this holding, problems which in my opinion could seriously disrupt the school system.

I had hoped that it could be shown that *West Virginia State Board of Education v. Barnette,* 319 U. S. 624 (1943), was decided upon the basis of freedom of religion and not freedom of speech. In that situation I envisioned an opinion in this case stating that the comments in *Bar-*

*nette* relative to freedom of speech were dicta; that although the Supreme Court's pronouncements upon Federal constitutional questions are binding upon us, its dicta, of course, are not binding; that it is well-nigh impossible in any given situation to know precisely how the Supreme Court will rule in a constitutional matter upon which it has not previously passed; [1] that in the absence of binding authority all one can do is use one's own best judgment, consulting, of course, similar cases, if any; and that with *Barnette* only as dicta on the freedom of speech issue, my best judgment was the statute was constitutional.

I find upon careful analysis of *Barnette* that the issue

---

1. If one had any doubt on this point he would need see only the comment of Mr. Justice Frankfurter in his dissent in Barnette, *supra*, relative to an area in which the Supreme Court had previously spoken. He said:

"I am fortified in my view of this case by the history of the flag salute controversy in this Court. Five times has the precise question now before us been adjudicated. Four times the Court unanimously found that the requirement of such a school exercise was not beyond the powers of the states. Indeed in the first three cases to come before the Court the constitutional claim now sustained was deemed so clearly unmeritorious that this Court dismissed the appeals for want of a substantial federal question. *Leoles v. Landers,* 302 U. S. 656; *Hering v. State Board of Education,* 303 U. S. 624; *Gabrielli v. Knickerbocker,* 306 U. S. 621. In the fourth case the judgment of the district court upholding the state law was summarily affirmed on the authority of the earlier cases. *Johnson v. Deerfield,* 306 U. S. 621. The fifth case, *Minersville District v. Gobitis,* 310 U. S. 586, was brought here because the decision of the Circuit Court of Appeals for the Third Circuit ran counter to our rulings. They were reaffirmed after full consideration, with one Justice dissenting.

"What may be even more significant than this uniform recognition of state authority is the fact that every Justice—thirteen in all—who has hitherto participated in judging this matter has at one or more times found no constitutional infirmity in what is now condemned. Only the two Justices sitting for the first time on this matter have not heretofore found this legislation inoffensive to the 'liberty' guaranteed by the Constitution. And among the Justices who sustained this measure were outstanding judicial leaders in the zealous enforcement of constitutional safeguards of civil liberties—men like Chief Justice Hughes, Mr. Justice Brandeis, and Mr. Justice Cardozo, to mention only those no longer on the Court." *Id.* at 664-65.

presented to the District Court of the United States for the Southern District of West Virginia and, therefore, to the Supreme Court, was whether "the law and regulations are an unconstitutional denial of religious freedom, and of freedom of speech, and are invalid under the 'due process' and 'equal protection' clauses of the Fourteenth Amendment to the Federal Constitution." Judge Digges might well in his opinion have quoted the next to the last paragraph of the Supreme Court's opinion in that case in which Mr. Justice Jackson said for the Court:

"We think the action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* at 642.

This was after, as Judge Digges has said, a careful analysis of the bases upon which the opinion to the contrary in *Minersville School District v. Gobitis,* 310 U. S. 586 (1940), rested.

Since I conclude that the Supreme Court decided *Barnette* on the issue of freedom of speech as protected by the First Amendment to the Constitution of the United States, it follows as night follows day that that opinion is controlling here. No useful purpose would be served by a recitation of some of the fears that cross my mind concerning possible attempts to extend this holding. I can only take comfort from the fact that although some of those fears seem to have crossed the mind of Mr. Justice Frankfurter, after a lapse of nearly 30 years many of them have not yet come about.

BARNES, J., dissenting:

I dissent because in my opinion the decision of the Supreme Court of the United States in *West Virginia State Board of Education v. Barnette,* 319 U. S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943) does not require us to hold

Chapter 737 of the Laws of Maryland of 1970 (the Act) unconstitutional and the Act is valid and constitutional.

The principal point of difference between the majority and me is in regard to the *holding* in *Barnette*. The majority has persuaded itself that the *holding* was based upon the "freedom of speech" provision in the First Amendment of the Constitution of the United States, as applied by prior decisions of the Supreme Court to the States allegedly through the "due process" clause of Section 1 of the Fourteenth Amendment to the Federal Constitution, and for that reason, *Barnette* is controlling in the present case. On the other hand, I am quite convinced that the *holding* in *Barnette* was that the West Virginia statute requiring school children to pledge allegiance to the flag of the United States of America was unconstitutional because it violated the "freedom of religion" clause of the First Amendment. This difference of opinion is of vital importance in the present case because Chapter 737 expressly *excludes* compliance by any pupil or teacher who for *religious* reasons does not wish to repeat the words of the pledge of allegiance. It is apparent, therefore, that if the *holding* in *Barnette* is limited to the "freedom of religion" clause, Chapter 737 meets this constitutional objection and we are not required under the Supremacy Clause of the Federal Constitution or under Art. 2 of the Declaration of Rights of the Maryland Constitution to hold that Chapter 737 is unconstitutional because of the holding in that case. If, however, *Barnette's holding* is that the West Virginia statute violated the "freedom of speech" clause of the First Amendment, then the Lundquists—appellees and plaintiffs below— may successfully contend that their rights of free speech are violated, they having expressly stated that they do not decline to comply with the compulsory direction to give the pledge of allegiance for any religious reason.

The majority opinion is interesting and even beguiling, but overlooks, in my opinion, the basic difference between a *holding*, on the one hand, and a *dictum*, on the other. As

I understand this difference, it is that a *holding* is that proposition of law *required* for the decision in the case; and if more than one principle of law may be applicable to the decision of the case, the *narrowest* principle necessary for the decision will be the holding. If other broader or more general principles of law are mentioned by the deciding court, its language in regard to the broader or more general principles of law is *dicta*. It is important to keep in mind this basic doctrine for the application of the all-important principle of *stare decisis* in our system of jurisprudence and to adhere to it strictly in view of the substantial (and to my mind largely unwarranted) extension of federal judicial power over the states and their courts by majorities of the Supreme Court of the United States during the last forty years purportedly through Section 1 of the Fourteenth Amendment. State appellate judges have the duty to sustain otherwise valid legislation of the Legislatures of their respective states unless such legislation conflicts with provisions of the Federal Constitution which have been *held* by the Supreme Court of the United States to be applicable. The duty of the state appellate judges under the Supremacy Clause of the Federal Constitution and in Maryland also under Art. 2 of the Declaration of Rights in the Maryland Constitution stops at this point and their duty to sustain the Constitution and Laws of their respective states begins. In short, there is no obligation upon this Court to *anticipate* what a majority of the Supreme Court will decide in the future in regard to the extension of federal judicial power allegedly through the Fourteenth Amendment (a most difficult if not impossible task in itself) ; its duty, as I see it, is to ascertain the *holdings* of the Supreme Court in this sensitive area, follow them as it must, but to await the decisions of the Supreme Court so far as any extension of those holdings is concerned.

It is entirely clear to me that the *holding* in *Barnette* is based—and must necessarily be based—upon the "freedom of religion" clause in the First Amendment.

This guarantee is obviously more narrow than the "freedom of speech" clause of the First Amendment in that many citizens in the Republic neither have nor profess any religion, but *all* use speech or its equivalent. The plaintiffs in *Barnette* filed the action to vindicate their religious freedom. Freedom of speech was clearly secondary and, even if presented as a possible ground for relief, is not the holding in the opinion of the "majority" opinion of the Supreme Court in *Barnette.* When one considers that *Barnette* overruled *Minersville School District v. Gobitis,* 310 U. S. 586, 60 S. Ct. 1010, 84 L. Ed. 1375 (1940) (only decided by the Supreme Court three years and eleven days before, after new appointments to the Supreme Court and a change of mind by two justices who participated and concurred in the majority opinion in *Gobitis*), which was clearly decided upon a rejection of any violation of the "freedom of religion" clause of the First Amendment as well as the dissenting opinion of Mr. Justice Frankfurter in *Barnette,* it becomes even clearer that this clause and not the freedom of speech clause was the basis of the holding in *Barnette.*

The plaintiffs in *Gobitis* and in *Barnette* were Jehovah's Witnesses. Their principal attack in both cases upon the pledge of allegiance and flag salute statutes in the respective cases was based on the "freedom of religion" clause. The "freedom of speech" clause was naturally added in both cases as a possible ground for unconstitutionality, but the more narrow "freedom of religion" ground, if thought to be violated, would necessarily be the *more narrow* principle and the necessary holding in that situation.

The "majority" opinion of Mr. Justice Jackson in *Barnette* shows that the Jehovah's Witnesses who filed the complaint in that case relied upon both the "freedom of religion" and the "freedom of speech clauses" (319 U. S. at 630, 63 S. Ct. at 1181, 87 L. Ed. at 1633). This "majority" opinion only spoke for three Justices, *i.e.,* Mr. Justice Jackson, Stone, C. J. and Rutledge, J. It is clear

562

from the Jackson opinion that an attempt was being
made to put the decision on the "free speech" clause, al-
though this is not *directly* stated, but rather obliquely at-
tempted in Mr. Justice Jackson's statement:

> "Nor does the issue *as we see it* turn on one's
> possession of *particular* religious views or the
> sincerity with which they are held. While reli-
> gion supplies appellees' motive for enduring the
> discomforts of making the issue in this case,
> many citizens who do not share *these religious
> views* hold such a compulsory rite to infringe
> *constitutional liberty of the individual.*"
> (Emphasis supplied.)
> (319 U. S. at 634-35, 63 S. Ct. at 1183, 87 L. Ed.
> at 1635-36.)

These weasel words are admittedly clever but hardly
cricket. At best, they only represented the opinion of the
three justices mentioned. Mr. Justice Roberts and Mr.
Justice Reed adhered to their views as expressed in *Go-
bitis* which, as we have seen, turned on the "freedom of
religion" clause. Mr. Justice Frankfurter dissented and
his masterful (and to my mind unanswerable) opinion
clearly shows that the "freedom of religion" clause was
the decisive constitutional principle involved.

To make up the majority for affirmance, at least two
of the three concurring justices must be added to the
Jackson three. Fortunately, Mr. Justice Murphy wrote a
separate opinion and Black and Douglas, JJ. also wrote
a concurring opinion.

A reading of the concurring opinion of Mr. Justice
Murphy shows conclusively, to my mind, that, although
he recognized that both freedom of religion and freedom
of speech were *raised* by the appellees, the determining
clause was that of freedom of religion. Indeed, he stated:

> "A reluctance to interfere with considered
> state action, the fact that the end sought is a de-

sirable one, the emotion aroused by the flag as a symbol for which we have fought and are now fighting again,—all of these are understandable. But there is before us the right of freedom to believe, freedom to worship one's Maker according to the dictates of one's conscience, a right which the Constitution specifically shelters. Reflection has convinced me that as a judge I have no loftier duty or responsibility than to uphold that spiritual freedom to its farthest reaches."
(319 U. S. at 645, 63 S. Ct. at 1188, 87 L. Ed. at 1641.)

He later stated:

"Official compulsion to affirm what is contrary to one's religious beliefs is the antithesis of freedom of worship which, it is well to recall, was achieved in this country only after what Jefferson characterized as the 'severest contests in which I have ever been engaged.'"
(319 U. S. at 646, 63 S. Ct. at 1189, 87 L. Ed. at 1641.)

A review of the concurring opinion of Black and Douglas, JJ.—the two justices who had joined in the majority opinion of Mr. Justice Frankfurter in *Gobitis,* but who changed their minds during the ensuing three-year period —makes clear beyond peradventure, as I see it, that the ground upon which they voted to hold the West Virginia statute unconstitutional in *Barnette* was based on the "freedom of religion" clause.

In the first place, they do not concur *wholly* in the Jackson opinion. They stated:

"We are *substantially* in agreement with the opinion just read, but since we *originally joined with the Court in the Gobitis* case, it is appropriate that we make a brief statement of reasons *for our change of view.*

"Reluctance to make the Federal Constitution a rigid bar against state regulation of conduct thought inimical to the public welfare was the controlling influence which moved us to consent to the *Gobitis* decision. Long reflection convinced us that although the principle is sound, its application in the particular case was wrong. *Jones v. Opelika,* 316 U. S. 584, 623, 62 S. Ct. 1231, 1251, 86 L. Ed. 1961, 141 A.L.R. 514. [Another Jehovah's Witness case in which Black and Douglas, JJ. dissented expressly on the 'freedom of religion' ground indicating that they now considered *Gobitis* wrongly decided and that they now believe that the government operating under the Bill of Rights 'has a high responsibility to accommodate itself to the religious views of minorities however unpopular and unorthodox these may be,' and that the *Jones* and *Gobitis* cases 'put the right freely to exercise religion in a subordinate position.'] We believe that the statute before us fails to accord full scope to the *freedom of religion* secured to the appellees by the First and Fourteenth Amendments."
(Emphasis supplied.)
(319 U. S. at 643, 63 S. Ct. at 1187-1188, 87 L. Ed. at 1640.)

The remaining portion of this concurring opinion deals with the limits of the right to the free exercise of religion and ends with the following statement:

"Neither our domestic tranquillity in peace nor our martial effort in war depend on compelling little children to participate in a ceremony which ends in nothing for them but a fear of *spiritual* condemnation. If, as we think, their fears are groundless, time and reason are the proper antidotes for their errors. The ceremo-

nial, when enforced against conscientious objectors, more likely to defeat than to serve its high purpose, is a handy implement for *disguised religious persecution. As such,* it is inconsistent with our Constitution's plan and purpose."
(Emphasis supplied.)
(319 U. S. at 644, 63 S. Ct. at 1188, 87 L. Ed. at 1641.)

In summary, even if it might be thought that the "freedom of speech" clause *could be a holding* in *Barnette* (which, in my opinion, it cannot be for the reasons already stated), it is clear that, at best, such a supposed "holding" was only obliquely put by Mr. Justice Jackson *for three justices* and that *all* of the remaining justices, two of whom were necessary for the composition of a majority of the Supreme Court, and necessary for affirmance in *Barnette,* held to the theory that the decision was controlled by the "freedom of religion" clause of the First (and Fourteenth) Amendment.

The high-flown and sometimes fanciful rhetoric of Mr. Justice Jackson in *Barnette,* relied on by the majority, thus clearly appears, as I see it, to be rather cloudy *dicta* at best on behalf of a *minority* of the Supreme Court and, however thin one slices it, it is still *dicta.* The holding in *Barnette* is consequently limited to the "freedom of religion" clause and does not *require* us to hold Chapter 737 unconstitutional.

The majority takes comfort in a *dictum* of Mr. Justice Harlan in *Street v. New York,* 394 U. S. 576, 593, 89 S. Ct. 1354, 1366, 22 L.Ed.2d 572 (1969)—a flag burning case, in which, curiously enough, Mr. Chief Justice Warren and White and Fortas, JJ. dissented—that *Barnette* "held that to salute the flag would violate the free expression assured by the Fourteenth Amendment" and then quoted the rhetoric from the Jackson opinion to which I have already referred.

As indicated—and as the Attorney General properly

argued—this is purely *dicta* on any theory and really adds nothing to the nature of the holding in *Barnette*. *Dicta* plus *dicta* still equals *dicta*.

Nor does the Supreme Court's decision in *Taylor v. Mississippi,* 319 U. S. 583, 63 S. Ct. 1200, 87 L. Ed. 1600 (1943)—decided the same day as *Barnette*—in my opinion support the majority opinion in regard to the holding in *Barnette*. Rather, it supports the position I think is the correct one. *Taylor* was also a Jehovah's Witness case involving a prosecution under a Mississippi statute making it a crime to state or publish material calculated to encourage violence, sabotage or disloyalty to the governments of the United States or of Mississippi. A Jehovah's Witness was indicted for distributing literature designed and calculated "to create an attitude of stubborn refusal to salute, honor and respect the flag and government of the United States." The Supreme Court, in reversing the conviction, in an opinion by Roberts, J., relied on *Barnette* and stated:

> "The statute here in question seeks to punish as a criminal one who teaches resistance to governmental compulsion to salute. If the Fourteenth Amendment bans enforcement of the school regulation, *a fortiori* it prohibits the imposition of punishment for urging and advising that, *on religious grounds,* citizens refrain from saluting the flag. If the state cannot constrain one to violate his conscientious *religious conviction* by saluting the national emblem, then certainly it cannot punish him for imparting his views on the subject to his fellows and exhorting them to accept *those* [i.e. religious] views."
> (Emphasis supplied.)
> (319 U. S. at 589, 63 S. Ct. at 1203-04, 87 L. Ed. at 1606.)

This looks to me like Mr. Justice Roberts and, indeed, the entire Supreme Court—since there were no dissent-

ing or concurring opinions in *Taylor*—was of the opinion that *Barnette* had, indeed, been decided on the "freedom of religion" clause.

In regard to the concurring opinion of my brother Smith, I will make a few observations. First of all, his first impression or "hope" was indeed the correct one. As already pointed out, the resonant rhetoric of Mr. Justice Jackson (a) *could not be* the holding in *Barnette* and (b) in any event, at best only represented the opinion on the "freedom of speech" point of three—not of the necessary five—justices. The first impression is often the sound one.

Secondly, I am happy that Judge Smith set out in footnote 1 the statement from the dissenting opinion of Mr. Justice Frankfurter in *Barnette* showing the extraordinary departure by the Supreme Court in *Barnette* from the doctrine of *stare decisis*. This departure from a well-established and recently confirmed constitutional doctrine is, in my opinion, close to judicial irresponsibility and is an added reason why we should not extend the holding in that case.

Thirdly, I cannot share Judge Smith's optimism that he "takes comfort from the fact that although some of those fears [of Judge Smith from possible attempts to extend the holding in *Barnette*] seem to have crossed the mind of Mr. Justice Frankfurter [apparently as expressed by him in the opinion for the Supreme Court in *Gobitis* and in his dissenting opinion in *Barnette*], after a lapse of nearly 30 years many of them have not yet come about." Not only has national unity been gravely impaired to an unprecedented extent during the 30-year period, but desecration, abuse and contempt for the flag and, indeed, for American institutions and ideals have substantially increased. We see a recent attempt to destroy the Nation's Capitol. The last report of the Selective Service officers indicated that at the time of the report more than 2,000,000 young men—otherwise qualified for the military service of their country—have refused

such service on grounds of supposed "concientious scruples" not resulting from any religious belief or teaching. This extraordinary lack of patriotism on the part of this many of the Republic's younger citizens and the other matters mentioned, in my opinion, present a situation today far worse than any visualized by Mr. Justice Frankfurter in 1940 or 1943. Indeed, a case might well be made for a finding of a "clear and present danger" to the Nation resulting from the lack of proper patriotic training in the public schools of this state and the public schools of other states. This issue is, however, not before us; and I will not elaborate upon it.

Another excellent reason for not extending the holding in *Barnette* is that, in my opinion, the provisions of the First Amendment and of selected portions of the remaining amendments through the Eighth are not properly part of the "due process" clause of the Fourteenth Amendment and were never intended so to be. I have expressed my opinion in this regard and some of my reasons for that opinion in various prior dissenting and concurring opinions. See *State v. Fowler,* 259 Md. 95, 142, 267 A. 2d 228, 253 (1970) ; *Brukiewa v. Police Commissioner of Baltimore City,* 257 Md. 36, 78, 263 A. 2d 210, 231 (1970) ; *Miller v. State,* 251 Md. 362, 383, 247 A. 2d 530, 541 (1968) ; *State v. Giles,* 245 Md. 342, 660-69, 227 A. 2d 745, 229 A. 2d 97-102 (1967) ; *Truitt v. Board of Public Works,* 243 Md. 375, 411, 221 A. 2d 370, 392 (1966) ; *State v. Barger,* 242 Md. 616, 628, 639-644, 220 A. 2d 304, 311, 317-319 (1966) ; *Montgomery County Council v. Garrott,* 243 Md. 634, 650, 653, 222 A. 2d 164, 172, 176 (1966) ; and, *Hughes v. Maryland Committee for Fair Representation,* 241 Md. 471, 491-513, 217 A. 2d 273, 285-298 (1966) .

It will not be necessary to repeat those reasons or to develop other reasons here. The hope I have expressed that the Supreme Court, itself, will proceed to correct this grave error, failing which the Congress, pursuant to its powers under Article III of, and paragraph 5 of the

Fourteenth Amendment to, the Federal Constitution, will correct it, continues to be unfulfilled.

In view of my position that the lower court should be reversed and the injunction vacated, it is appropriate that I give my opinion briefly in regard to the other points, raised and argued, that Chapter 737 is unconstitutional. It was not necessary for the majority of the Court to reach or decide these points because of its opinion that *Barnette* controlled.

The contention was made that the portion of Chapter 737 prohibiting acts of disrespect was unconstitutionally vague. The lower court was of the opinion that this contention was correct relying upon language from a concurring opinion of Mr. Justice Rutledge in *U.S. v. C.I.O.,* 335 U. S. 106, 141, 68 S. Ct. 1349, 1366, 92 L. Ed. 1849, 1871 (1948) and *Baggett v. Bullet,* 377 U. S. 360, 378, 84 S. Ct. 1316, 1326, 12 L.Ed.2d 377, 385 (1964). In my opinion, the lower court was in error in sustaining this contention. The statutes in question in *U.S. v. C.I.O., supra* (Federal Corrupt Practices Act) and in *Baggett, supra* (a state loyalty oath by teachers) were quite different in terms from the challenged provision of Chapter 737.

As properly construed the "act of disrespect" mentioned in Chapter 737 must occur to the flag when the pledge of allegiance is given. Disrespect at other times would be covered by other provisions of the Maryland Code. See, for example, Maryland Code (1971 Repl. Vol.), Art. 27, § 81 *et seq.* The "act of disrespect" contemplates an *affirmative* act of disrespect to the flag, that is, something more than standing silent. See *Bolling v. Superior Court for Clallam County,* 16 Wash. 2d 373, 133 P. 2d 803, 809 (1943). A reasonable person can understand what conduct Chapter 737 forbids and this is all that is required. See *United States v. National Dairy Products,* 372 U. S. 29, 32, 83 S. Ct. 594, 597-98, 9 L.Ed.2d 561 (1963) ; *Richards Furniture Corp. v. Board of County*

*Commissioners of Anne Arundel County,* 233 Md. 249, 264, 196 A. 2d 621, 629 (1964) and cases therein cited.

Counsel for the appellees abandoned at the argument contentions in regard to an alleged establishment of religion and denial of equal protection of the laws.

No point was raised by the appellees that Chapter 737 was unreasonable, arbitrary or capricious and thus a denial of due process as not being reasonably related to the evil the General Assembly sought to cure by the legislation. Arguments of this type would, in my opinion, go only to the wisdom of the enactment of the statute and with this we are not concerned. See *Gino's of Maryland v. City of Baltimore,* 250 Md. 621, 636-37, 244 A. 2d 218, 226-227 (1968) and cases therein cited. It may well be that a better or wiser type of statute to accomplish the legislative purpose could have been devised and several come to mind. As I have indicated, however, these are legislative questions and are not for determination by the courts.

I would reverse.