HARNISH ET UX. *v.* HERALD-MAIL CO., INC. ET AL.

[No. 81, September Term, 1971.]

*Decided January 21, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Justin N. Scharf* for appellants.

*John H. Urner* and *David W. Byron,* with whom were *Byron, Moylan & Urner* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court. BARNES and FINAN, JJ., dissent and BARNES, J., filed a dissenting opinion in which FINAN, J., concurs at page 338 *infra.*

Richard Harnish, a chiropractor and owner of rental properties, and his wife, Doris Jane, sued the Herald-Mail Co., Inc., which owns and publishes two newspapers in Hagerstown, The Daily Mail (an evening edition), and The Morning Herald, and Philip Ebersole, a reporter, on an amended declaration in three counts. The first count alleged that Dr. Harnish had been libelled by a story written by Ebersole and published in The Daily Mail on October 3, 1967 and in The Morning Herald the next day. The second alleged that the article complained of wilfully and maliciously violated the right of privacy

of the doctor and his wife. The third count alleged that the Herald-Mail Co. and Ebersole, by writing, publishing and circulating the article, "did wilfully, wrongfully and maliciously conspire" to deprive the plaintiffs of their reputation, their income and their ability to earn a livelihood. Judge Clapp, sitting in the Circuit Court for Frederick County, directed a verdict for the defendants on counts two and three at the end of the plaintiffs' case and similarly directed a verdict on the first count at the end of the whole case. Preliminarily, Judge McLaughlin had dismissed Mrs. Harnish as a plaintiff and South Bend Tribune, Inc. (the owner of all the stock of Herald-Mail Co.), a foreign corporation doing no business and having no presence in Maryland, which had been a defendant in the original declaration.

The appellants complain strongly that both dismissals were erroneous. Since we find that Judge Clapp rightly found as a matter of law that the appellants had no cause of action against anybody sued, there is no need to decide the point.

The story which Dr. Harnish finds offensive and harmful to him came to be written and published in this wise.

At least as early as 1966 Hagerstown was facing and attempting to correct the problem and the presence of too much substandard rental property. The matter had become one of public interest and concern. Evidence of this was to be found in a number of newspaper articles written by Ebersole and published in The Daily Mail and The Morning Herald on various aspects of the problem and its effect on the people who had to live in such properties. In order to keep abreast of the situation, Ebersole regularly visited the office in the City Hall of one Walter J. Nye, a plumber by trade who had been employed by the City as a housing inspector, in search of newsworthy material. Nye's inspections had turned up a large proportion of houses that were in substantial and potentially harmful violation of housing and sanitary codes. One nest of such substandard dwellings, which

Nye had inspected, was on North Locust Street. They long had been known as Potlikker Flats and in general had reached such a physical point of no return that the City of Hagerstown was tentatively considering their acquisition in order to raze them and widen the street on which they fronted. Dr. and Mrs. Harnish owned 634 North Locust Street, one of the Potlikker Flats houses. They had bought it for $1,500, giving back to the seller a mortgage for $1,500. This house was rented to a family named Reeder for $40.00 a month. Nye had inspected this house in the late summer of 1967 and had found numerous violations of the code. After Dr. Harnish had failed to make the repairs Nye had notified him he should make, Nye decided to do what he had done on other occasions—give the situation publicity. Ebersole gave this account from the stand of what happened:

> "Well, I was at City Hall checking the offices and I ran into Joe Nye and he told me that he had what he thought might be a very good story for me. That it involved a large family that were living under substandard conditions and that had a son who had been disabled in Vietnam that—who had no home to come to and that he was interested in publicizing them both because to generally show another example of bad housing conditions in the city and also this might help him in his efforts to find a new home for this family. So I asked him if the family would be willing to have me go in their house and be interviewed and he said that he thought they would and I asked him if he thought he could set it up for me and he said he would."

Ebersole and Nye went to the home of the Reeder family, where Ebersole talked with the husband and father, Elmer Reeder, advising him that he was a reporter. Reeder showed him through the house, pointing out its defects and disrepair. Reeder agreed to be quoted in the article Ebersole proposed to write. Ebersole then

talked to Dr. Harnish on the telephone, who, says Eber-
sole, "made statements about the house and about his
intentions to me."

Ebersole wrote his story which appeared in The Daily
Mail on September 27, 1967 and in The Morning Herald
the next morning. The story was headed "Wounded Ma-
rine's Home Seen Violating Code." The two lead para-
graphs, alongside a picture of a Marine in uniform, said:

> "The Potlikker Flats home of a Marine
> wounded in Vietnam has been charged to be in
> violation of the Hagerstown Housing Code.
>
> "Dennis E. Reeder, 19, lived with his mother,
> father and five brothers and sisters in a 13-foot
> wide house on the 600 block of N. Locust St. be-
> fore enlisting in the Marines a year and a half
> ago. Now he is a patient at the U. S. Naval
> Hospital at Bethesda, recovering from wounds
> in both legs suffered at DaNang."

The story went on to detail the many code violations at
the Reeder home and recited that the father said they
would have trouble getting the wounded son through
the broken doorway in a wheel chair and protecting him
from drafts through the holes in the walls and windows
when he soon came home on a thirty-day leave. Dr.
Harnish's side of the story also was detailed. He already,
he said, had spent hundreds of dollars on the place and
would spend more when he could get it, but not until
he got a guarantee from the City of Hagerstown that it
was not going to tear down Potlikker Flats. He had in-
stalled three-quarter panelling in the living room this
year, as well as electrical outlets, so that physiotherapy
equipment for Dennis Reeder's injured legs could be
plugged in. Ebersole then wrote: "the partially-panelled
living room made a good impression on a visitor and so
did the cleanliness and neatness of the house generally."
He quoted Dr. Harnish as saying: "It is a poor invest-
ment * * *. The worst property I have. More headaches,"
and as saying further that he intended to do something

about the broken windows and walls and that "there are simply not many places in Hagerstown where a family of seven or eight can rent for $40 or $45 a month. * * * Loans at low interest rates to landlords for improvement to their properties might be one answer * * *."

Mrs. Harnish kept the accounts and records of the family's rental properties. On September 28, the day Ebersole's story appeared in The Morning Herald, she wrote and sent an eviction notice to 634 North Locust Street over the typewritten name of Dr. Harnish. Apparently, she thought the head of the family was a James Reeder—although actually he was named Elmer and there was no James—for she addressed the notice to James Reeder. The eviction date was set in the notice as October 1, three days from the date of the notice, although she meant to write October 31.

Several days later—apparently October 2—Nye gave Ebersole a photostatic copy of the eviction notice. Ebersole telephoned Dr. Harnish and discussed the notice and the situation with him, and then wrote the story which appeared in The Daily Mail on October 3 and The Morning Herald on October 4 and which Dr. Harnish says libelled him by falsely saying he sent an eviction notice to a wounded marine, and by insinuating that the Harnishes require tenants to be grateful to them, and that they are spiteful and vengeful persons. The story in The Morning Herald had the headline "Wounded GI's Family Gets Landlord's Eviction Order." The headline in The Daily Mail was "Wounded Marine's Family Evicted From Home After Code Complaints." The story read:

> "The father, mother and five brothers and sisters of a wounded Marine have been given an eviction notice to leave their home at 634 N. Locust St.
>
> " 'I just don't have time to be bothered with people who are ungrateful,' said their landlord, Dr. Richard Harnish.
>
> "The premises were cited for alleged viola-

tions of the City Housing Code by Housing Inspector Joseph Walter Nye, but this dwelling was not one of the eight Potlikker Flats houses condemned under the Housing Code.

"Elmer Reeder, his wife and five children live there. A sixth child, James Reeder, 19, is a patient at the U.S. Naval Hospital at Bethesda, where he is slowly recovering from leg wounds suffered while serving with the U.S. Marines in Vietnam.

"The elder Reeder said it would be easier to bring his son home for a visit if cracks in the wall were patched up and the doorway were fixed so his son's wheelchair could be brought through more easily.

"Dr. Harnish sent this notice:

Sept. 28, 1967

Mr. James Reeder
634 N. Locust St.
Hagerstown
Dear Mr. Reeder

    This is a thirty days notice required by law requested that you vacate the premises at 634 N. Locust St., Hagerstown, by October 1, 1967.

Very truly yours,
Richard G. Harnish
D.C.

"It may be noted that the letter is addressed to James Reeder, the wounded Marine whose name was mentioned in a newspaper story last week, and not to Elmer Reeder, who is the actual head of the household there.

"Dr. Harnish said he has done the Reeder family many favors, including forgiving a $150 debt.

"'There is no vengeance here,' he said, 'Let Joe Nye find them a decent place to live.'

"Housing Inspector Nye said he will contact veterans' organizations to see if any of them can help the wounded Marine's family to find other living quarters."

Dr. Harnish says the article contained an explicit false statement, namely, that he had sent the notice to the Marine, named James, when actually the Marine's name was Dennis and he had intended to send the notice to the father, Elmer.

About two weeks later Dr. Harnish met Ebersole in a restaurant and this colloquy ensued, according to Ebersole:

"[Dr. Harnish] said, Phil, you made an error in your story about the Reeder family. The eviction notice was not sent to the Marine. And I said, well, if we did make an error I am very sorry about it. I will check on it and if it was wrong we will run a correction."

Ebersole wrote a correction for the following day's paper and it was printed a day after that on the second most prominent page of the paper in a box in heavy black type.

Dr. Harnish was not only a landlord and chiropractor. For nine years prior to 1966 he had been a member of the five-man Hagerstown Housing Authority Board. He was active in politics and had been a candidate for a seat in the House of Delegates in 1958, 1962 and 1966 Democratic primaries. In the 1962 and 1966 campaigns he had publicized his interest and involvement in adequate housing.

Judge Clapp found that the state of public housing and substandard housing were matters of general public interest and concern in Hagerstown and a field of legitimate inquiry and exposition by the newspapers, and that Dr. Harnish was a public figure, particularly in the field of housing. He found the law to be that a public figure cannot recover for a libel, even a false defamatory state-

ment, unless he shows that the falsehood was written and printed with malice or with a reckless or wanton disregard of its truth or falsity, and found neither malice nor wantonness.

We think Judge Clapp did not err in his finding that Dr. Harnish was a public figure and his finding that the subject matter with which the allegedly libelous story dealt was within the area of general interest and concern of the citizens of Hagerstown as a whole (although the latter finding when he made it did not have the significance it has since attained under the late decisions of the Supreme Court of the United States). His analysis of the law as it then stood was sound, as was his finding that neither malice nor wantonness on the part of Ebersole and the newspapers had been shown. See *A. S. Abell Company v. Barnes,* 258 Md. 56.

We tend strongly to the view that Ebersole's erroneous statement that the eviction notice had been sent to the wounded Marine, read in the context of the story as a whole, did nothing to make the story libelous in the traditional sense. The Harnishes say the story made them appear vindictive, callous, hardhearted, vengeful landlords because they were about to throw out of the home a wounded Marine and his family and this was a libel. It was true, as the Harnishes admit, that they did intend to make a family, one member of which was a wounded Marine, move out of their rental property because the family had brought about publicity about the failure of the landlords to keep the house in repair. The fact that the eviction notice, which was to bring about the moving out of the whole family, had been addressed to the Marine rather than his father had that been the case, would not add to or lessen the basic fact that the landlords intended to evict the whole family, including the Marine, or significantly add to or lessen the chance that readers would decide the landlords were nasty people, the reaction the Harnishes complain of. It is not clear that being made to appear a nasty person is a libel—compare *Greenbelt Coop. Pub. Assoc. v. Bresler,* 398 U.

S. 6, 26 L.Ed.2d 6, and *Werber v. Klopfer,* 260 Md. 486
—but if it is, the landlords were not made to appear
nastier because they sent the notice to the wrong per-
son. The nastiness, if there was any, was in the inten-
tion to evict, not in the name on the notice of the inten-
tion, and Ebersole wrote nothing false about the inten-
tion. The accuracy of nothing in the article, including
the quotes from Dr. Harnish, is challenged, other than
the statement that the notice was addressed to the Ma-
rine.

We need not flatly decide the point because if it be as-
sumed that the erroneous statement was libelous on its
face, it would not help Dr. Harnish. On June 7, 1971, in
*Rosenbloom v. Metromedia,* 403 U. S. 29, 29 L.Ed.2d 296,
the Supreme Court broadened the rule and the scope of
*New York Times v. Sullivan,* 376 U. S. 254, 11 L.Ed.2d
686, and the similar cases which followed it. The Court
decided that a person who is neither a public official nor
a public figure may not recover if the allegedly defama-
tory statement related to his involvement in a matter of
public or general concern, unless he can meet the burden
the public official or public figure had to meet under the
test of *New York Times.* The trial court had instructed
the jury that the Pennsylvania law imposed liability on
the news media for publishing falsehoods if reasonable
care was not used in ascertaining the truth of reports.
*Metromedia* rejected that standard on a constitutional
basis. It said (p. 315 of 29 L.Ed.2d) that reasonable care
is an "elusive standard" which in the words of *Time,
Inc. v. Hill* at p. 389 of 385 U. S.: "would place on the
press the intolerable burden of guessing how a jury might
assess the reasonableness of steps taken by it to verify
the accuracy of every reference to a name, picture or
portrait." The Court then went on to say:

> "We thus hold that a libel action, as here, by a
> private individual against a licensed radio sta-
> tion for a defamatory falsehood in a newscast
> relating to his involvement in an event of public

or general concern may be sustained only upon clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not."

We hold that Dr. Harnish did not offer clear and convincing proof that the error he complains of was published with knowledge that it was false or with reckless disregard for its truth or falsity. *A.S. Abell Company v. Barnes,* and *Rosenbloom v. Metromedia,* both *supra.* It ill lies in the mouth of Dr. and Mrs. Harnish to say that the publication of their expressed mistaken belief that the head of the Reeder family was named James (rather than Elmer) amounted to malice or reckless disregard of truth or falsity. The conclusion the record offers would rather seem to be that Ebersole obviously assumed—although carelessly and forgetfully—that James was Elmer's son. The testimony permits no clear and convincing proof of other than a careless and even stupid—although probably harmless—mistake on Ebersole's part. There was no clear and convincing proof of a knowing wilfulness or gross error on the part of Ebersole and the newspapers that would meet the required constitutional standards established by the Supreme Court as binding on the States.

What has been said also disposes of the invasion of privacy claim. In *Household Fin. Corp. v. Bridge,* 252 Md. 531, in reviewing *Carr v. Watkins,* 227 Md. 578 (in which we stated that in a proper case Maryland would recognize that there is redress for an unwarranted invasion of privacy), Judge Finan pointed out that four kinds of invasion of privacy are generally recognized (p. 537 of 252 Md.) :

" '(a) Unreasonable intrusion upon the seclusion of another, * * *

(b) Appropriation of the other's name or likeness, * * *

(c) Unreasonable publicity given to the other's private life, * * *
(d) Publicity which unreasonably places the other in a false light before the public, * * *.' "

Obviously, only the last two are possible grounds here, the third being of doubtful pertinence. The fact that Dr. Harnish received the publicity as a result of his relation to a matter of general public interest keeps any invasion of his privacy, if invasion there was, from being unreasonable and actionable. In footnote 1 of *Metromedia,* the Court said the libel case standards were applicable to suits for invasion of privacy, citing *Time, Inc. v. Hill,* 385 U. S. 374, 17 L.Ed.2d 456. The Court also said in *Metromedia,* pp. 314-315 of 29 L.Ed.2d, that the libel laws protect two separate interests of an individual, one being his desire to preserve a certain privacy around his personality from unwarranted invasion. It continued:

"The individual's interest in privacy—in preventing unwarranted intrusion upon the private aspects of his life—is not involved in this case, or even in the class of cases under consideration, since, by hypothesis, the individual is involved in matters of public or general concern."

The conspiracy claim deserves and will receive short shrift. It is doubtful at the least that an employee of a corporation and that corporation can conspire where the employee is acting only for the corporation and not for any personal purpose of his own. 16 Am.Jur.2d *Conspiracy* § 47; *Nelson Radio & Supply Co. v. Motorola,* 200 F. 2d 911, 914 (5th Cir. 1952), *cert. denied,* 345 U. S. 925; *Arthur v. Kraft-Phenix Cheese Corporation,* 26 F. Supp. 824, 829-830 (D. Md. 1938, Chesnut, J.).

In any event if such a conspiracy is possible, there was not a shred of evidence of any conspiracy by or between Ebersole and the Herald-Mail Co.

*Judgments affirmed, with costs.*

Barnes, J., dissenting:

I dissent because, in my opinion, there was, at least, sufficient evidence in the case to have the jury consider (1) whether the plaintiff and appellant, Dr. Harnish, was a "public figure," and (2) whether, if the jury found that he was a "public figure," the defendant and appellee, Philip Ebersole, was guilty of actual malice in reporting the false material, later published, in that he (a) had "actual knowledge of its falsity" or (b) was guilty of "reckless disregard of its truth or falsity."

### 1. *Public Figure.*

With respect, I cannot agree with the majority that the "public official" concept enunciated by the Supreme Court of the United States in *New York Times v. Sullivan,* 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964) and the later "public figure" concept which arose from the companion cases of *Curtis Publishing Co. v. Butts,* and *Associated Press v. Walker,* 388 U. S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967) have been "broadened" to include any person involved in "a matter of public, or general concern," by the case of *Rosenbloom v. Metromedia,* 403 U. S. 29, 91 S. Ct. 1811, 29 L.Ed.2d 296, decided June 7, 1971.

In the first place, *Rosenbloom* does not *hold* anything. There is no majority opinion. There is a *plurality* opinion rendered by Mr. Justice Brennan and joined by Chief Justice Burger and Justice Blackmun. If one considers the concurring opinion of Mr. Justice Black—who concurred *in the judgment* on the basis of his notion that there should be no recovery in libel at all by a person defamed by the press—to be an oblique ratification of the new Brennan view, even here there would be the concurrence of only four justices and not the necessary five for a *holding* by the Supreme Court. The Brennan view that the publication of material of "public or general concern" should be sufficient to trigger the federal criteria has not become a new federal rule broadening *New York Times* and *Curtis Publishing Co.*

Mr. Justice White, while concurring in the judgment to make up the five justices to support the affirmance (otherwise there would have been an affirmance by an evenly divided Supreme Court), makes it quite clear that he *does not concur in the reasoning and basis* of the Brennan opinion. He stated in conclusion:

> "I would accordingly hold that in defamation actions, absent actual malice as defined in *New York Times Co. v. Sullivan,* the First Amendment gives the press and the broadcast media a privilege to report and comment upon the official actions of public servants in full detail, with no requirement that the reputation or the privacy of an individual involved in or affected by the official action be spared from public view. Since respondent Metromedia did nothing more in the instant case, I join with the Court in holding its broadcasts privileged. I would not, however, adjudicate cases not now before the Court."
> (403 U. S. at 62, 91 S. Ct. at 1829, 29 L.Ed.2d at 322.)

In the dissenting opinions of Mr. Justice Harlan and of Mr. Justice Marshall, concurred in by Mr. Justice Stewart, it is apparent that *they* consider that "the public official—public figure" requirement to have the federal libel criteria supersede the state libel law, is still viable, and should continue. In short, a majority of the Supreme Court of the United States has not *yet* indicated that the Supreme Court has so greatly broadened *New York Times* and *Curtis Publishing Co.* and neither should we. This is particularly true in a legal situation in which, in the opinion of many, the extension of federal judicial construction of the provisions of the First Amendment through the "due process" provision of the Fourteenth Amendment is unwarranted and unsound. I have expressed myself in this regard in several concurring and dissenting opinions and do not find it necessary to repeat what I observed in those opinions. See *State v.*

*Lundquist,* 262 Md. 534, 558, 568, 278 A. 2d 263, 276, 281 (1971); *State v. Fowler,* 259 Md. 95, 108, 142, 267 A. 2d 228, 236, 253 (1970); *Brukiewa v. Police Commissioner of Baltimore City,* 257 Md. 36, 59, 78, 263 A. 2d 210, 222, 231 (1970); *Miller v. State,* 251 Md. 362, 383, 247 A. 2d 530, 541 (1968); *State v. Giles,* 245 Md. 342, 660, 227 A. 2d 745, 229 A. 2d 97 (1967); *Truitt v. Board of Public Works,* 243 Md. 375, 411, 221 A. 2d 370, 392 (1966); *Montgomery County Council v. Garrott,* 243 Md. 634, 650, 656, 222 A. 2d 164, 172, 176 (1966); *State v. Barger,* 242 Md. 616, 628, 639, 220 A. 2d 304, 311, 317 (1966); and *Hughes v. Maryland Committee for Fair Representation,* 241 Md. 471, 491, 217 A. 2d 273, 285 (1966). The point is that, although we are bound by the supremacy clause in the Federal Constitution and by Art. 2 of the Declaration of Rights in the Maryland Constitution to give effect to *holdings* of the Supreme Court in construing and applying the Federal Constitution as those provisions are thought to apply to the States, nothing short of a *holding* releases us from our obligation to support and apply the Maryland Constitution, laws and decisions in a particular case. Secondly, *Rosenbloom* was decided substantially after the verdict and judgment in the present case were entered. In view of some of the new and curious holdings of the Supreme Court in prior cases in regard to whether or not a decision overruling prior Supreme Court holdings is retroactive in effect, it is by no means clear that *Rosenbloom* would have such retroactive effect in the instant case, even assuming, *arguendo,* that *Rosenbloom* did "broaden" *New York Times* and *Curtis Publishing Co.*

I have concluded, therefore, that the *holdings* of the Supreme Court in *New York Times* and *Curtis Publishing Co.* in regard to "public officials" and "public figures" are still binding and that *Rosenbloom* does not require that those holdings now be disregarded.

Obviously, Dr. Harnish was not a "public official" and, as such, within the purview of *New York Times.* This is conceded.

Was there sufficient evidence in the case which would support a jury finding that Dr. Harnish was not a "public figure"? In my opinion, such a finding would be supported by the evidence. Indeed, it is, as I see it, a close question as to whether or not the trial court should not have found as a *matter of law* that there was insufficient evidence to support a contrary finding, requiring a mandatory instruction to the jury that he was not a "public figure." Apparently, Judge Clapp was originally of this opinion. After hearing argument of counsel for the defendants, Herald-Mail Co. and Ebersole, on the "public figure" point, he stated:

> "Court: Well, my reaction though to your argument is that this question of a public figure is a complete afterthought that the Herald-Mail wasn't thinking of Dr. Harnish as a public figure in any sense when it wrote this article, otherwise it would have said former member of the housing authority, former candidate for the House of Delegates. I say I am unconvinced that the public figure matter applies here."

Later, however, Judge Clapp apparently came to the opposite conclusion, stating to the jury when he directed the verdict in favor of the defendants:

> "My first decision as a matter of law was required to be whether this plaintiff, Dr. Harnish, was a public figure, not a public official. It is already agreed that he had left the housing authority—but whether he was a public figure in Hagerstown on October 3, 1967 when this alleged libel was taken. Upon the examination of the uncontradicted evidence I came to the conclusion that he was. He had been a member of the housing authority in Hagerstown for a period of 9 years, leaving that office just a year before this alleged libel. He was in a field of public housing that was the subject matter of this

article and a series of articles that had been conducted by the newspaper-defendant. So that there were items of *public interest* and certainly, it seemed to me, at least as a matter of law, that a man who had been in that field for a period of 9 years was a public figure in the sense that the people of Hagerstown would be interested in what he would or would not do in the field of housing. It also happened that he was a landlord and he had given this notice there in that place where the housing was substandard.

"So, I say, it seemed on the basis of the public generally *being interested* in the improvement of substandard housing and his activity in this field, he was a public figure in that sense." (Emphasis supplied.)

Judge Clapp's first impression was the correct one, as first impressions are apt to be. His final conclusion was in error, in my opinion, and represents a "blend," as it were, of *Curtis Publishing Co.* and the plurality opinion in *Rosenbloom.*

The theory underlying the "public official" doctrine was that public officials had access to the press by virtue of their office to refute the false material, and the balancing of the policy favoring a robust criticism of public officials, as against the policy of the protection of persons from loss of reputation from false publication, required that the press not be subject to recoveries for libel except in cases of knowledge of falsity or reckless disregard of truth or falsity. The "public figure" concept rests upon the same basic assumption, the Supreme Court finding it difficult to distinguish between the access of a "public figure" to the press, from the access of a "public official" to the press. Hence, the "public official" concept was extended to the "public figure" as well. *Curtis Publishing Co., supra,* 388 U. S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967).

The trial court rested its conclusion that Dr. Harnish

was a "public figure" upon his membership on the five-man Hagerstown Housing Authority for nine years, his membership ending, however, *a year* prior to the false publications. Judge Clapp also mentioned the abortive attempts of Dr. Harnish to be nominated as a candidate of the Democratic Party for the House of Delegates in the primaries in 1958, 1962 and 1966. These abortive attempts were obviously those of an amateur, and he was handily defeated. It is not contended that Dr. Harnish ever had, or had at the time of the false publications, any political power or influence.

Nor was his membership on the Hagerstown Housing Authority such as to make him a "public figure" within the meaning of *Curtis Publishing Co.* It was uncontradicted that such membership was meaningless and that the decisions of the Authority were controlled by the federal housing officials. This membership—although true—was not so much as mentioned in any of the false publications. Apparently *the defendants* did not think such membership was a matter of public importance or even of public interest and could not make Dr. Harnish a "public figure." There was no showing that *he* had any "access to the press" and the reasonable inferences are that he did not.

Even if we assume for the purposes of the argument, that there was *some* evidence from which a jury might conclude that Dr. Harnish was a "public figure," surely this issue should have been left to the jury under proper instructions for *its* determination.

I am becoming increasingly alarmed by statements in opinions of some of the justices of the Supreme Court in libel and pornography cases in regard to a supposed "independent constitutional judgment" *on the facts.* If this means that an appellate court is at liberty to substitute its notions of what the jury should have found, but did not find, on conflicting evidence or on reasonable inferences from evidence, then such position, in my opinion, should be held to be unconstitutional in the federal courts as clearly contrary to the *express provisions*

of the Seventh Amendment of the Federal Constitution which provides:

> "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

It should also be held to be unconstitutional in Maryland as it conflicts with the provisions of Art. 5 of the Declaration of Rights of the Maryland Constitution which, in relevant part, provides:

> "That the Inhabitants of Maryland are entitled to the Common Law of England and to the trial by Jury, according to the course of that Law, * * *"

In the plurality opinion of Mr. Justice Brennan in *Rosenbloom* appears the following extraordinary statement:

> "Moreover, we ordinarily decide civil litigation by the preponderance of the evidence. Indeed, the judge instructed the jury to decide the present case on that standard. In the normal civil suit where this standard is employed, 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' *In re Winship*, 397 U. S. 358, 371, 90 S. Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (concurring opinion of Harlan, J.). In libel cases, however, we view an erroneous verdict for the plaintiff as most serious. Not only does it mulct the defendant for an innocent misstatement—the three-quarter-million-dollar jury verdict in this case could rest on such an error—but the possibility of such error, even beyond

the vagueness of the negligence standard itself, would create a strong impetus toward self-censorship, which the First Amendment cannot tolerate. These dangers for freedom of speech and press led us to reject the reasonable-man standard of liability as 'simply inconsistent' with our national commitment under the First Amendment when sought to be applied to the conduct of a political campaign. *Monitor Patriot Co. v. Roy,* 401 U. S. 265, 276, 91 S. Ct. 621, 625, 28 L.Ed.2d 35 (1971). The same considerations lead us to reject that standard here." (403 U. S. at 50-51, 91 S. Ct. at 1823, 29 L.Ed.2d at 315-16.)

In my opinion, it begs the question for an appellate court to speak of "an erroneous verdict for the plaintiff" if such a verdict is based upon the evidence and the reasonable inferences from that evidence under proper instructions by the trial court. The evaluation of evidence and inferences is *for the determination by the jury,* not for the determination of a court—*nisi prius* or appellate. Merely because the jury made an evaluation that the appellate court—if it had sat as the jury—would not have made does not make the jury's verdict "erroneous."

It is not lacking in irony that the apparent effort of pluralities and even majorities of the Supreme Court to maximize—unduly in my opinion—the operation and effect of provisions of the First Amendment may well result in destroying, or gravely impairing, the equally, if not more important, constitutional right of trial by jury by the course of the common law and flies squarely in the teeth of an express prohibition in the Seventh Amendment. This Court should, in my opinion, be slow in embracing such a strange and dangerous doctrine.

## 2.

If it be assumed, *arguendo,* that Dr. Harnish was a "public figure" as a matter of law and that the federal

criteria apply, even then there was, in my opinion, quite sufficient evidence of actual malice to require this issue to be submitted to the jury, however searching "an independent constitutional judgment" on the facts might be. As I view the evidence, there was indeed sufficient— if not conclusive—evidence of (a) "actual knowledge of falsity" by the reporter Ebersole or (b) that he was guilty of "reckless disregard of truth or falsity."

I turn to a consideration of the evidence in regard to these matters.

(a) *Actual knowledge of falsity.*

The present case is extraordinary in containing admissions from the reporter that he knew—had actual knowledge—of the falsity of important portions of the defamatory material.

One of the most damaging parts of the defamatory material was that Dr. Harnish was oppressing a veteran by the landlord's failure to make necessary repairs to the rented property. In cross-examination, Ebersole admitted that when he prepared the articles he "knew" that the wounded veteran was not at that time "residing at [634] North Locust Street." The cross-examination then continued:

> Q. Nevertheless, you printed the notice to quit and the notice to quit said, 'Mr. James Reeder, 634 N. Locust St., Hagerstown. Dear Mr. Reeder: (And the letter was dated September 28 and the letter states:) This is a thirty days notice required by law requesting that you vacate the premises at 634 N. Locust St., Hagerstown, by October 1, 1967. Very truly yours, Richard G. Harnish, D. C.' And then you went on to state: 'It may be noted that the letter is addressed to James Reeder, [the wounded veteran] . . . .' So it is definitely not true that the letter was addressed to the wounded veteran because the wounded veteran was down there at

the United States Naval Hospital, right? A. That is correct, yes. Because his name was Dennis.

"Q. And you had written the story a few days previously in which a picture of Dennis Reeder was exhibited, right? A. Right."

Again, the headline in The Morning Herald of September 28, 1967,[1] "New Jolt For A Wounded Marine" with a picture of Dennis E. Reeder in uniform was intended to convey the impression that Dennis was injured by the building code violations. Ebersole admitted that he knew that Dennis did not live in the property and in the body of the article it appears that Dennis was "a patient at the U. S. Naval Hospital at Bethesda, recovering from wounds in both legs suffered at DaNang."

In the October 3, 1967, publication in The Daily Mail, Ebersole's article carried a headline, "Wounded Marine's Family Evicted From Home After Code Complaints."

The cross-examination of Ebersole indicated:

"Q. It is [sic: Is it] not generally recognized in the newspaper industry that more attention is paid to the heading of an article than to the body of the article? The heading is where the most impact is. A. The headline is important, certainly.

"Q. Now, you knew that when you wrote this article that he had not actually evicted anybody. Yet you used the word 'evicted.' 'Wounded Marine's Family Evicted From Home.' A. Well, he had sent an eviction notice. That is all he has to do.

"Q. And a notice to quit. He hadn't evicted anybody. Do you not know that the Reeders continued to live on the property until the city purchased it? A. Yes."

---

1. This article, although not part of the declaration, was admitted into evidence by the trial court for consideration in connection with malice on the part of the reporter.

In playing up the "veteran" angle, the jury could well have found that this was employed to inflict the maximum injury upon Dr. Harnish in view of the testimony of Charles E. Price, the Sheriff of Washington County, that Hagerstown is "a community that has a high regard for its veterans." Mr. Nye, the housing inspector, communicated with the Hagerstown veterans organizations about the matter and stated that he advised Ebersole during the times he was talking with him that Nye "would contact veterans' organizations."

In The Morning Herald of September 29, 1967,[2] Ebersole published a picture he had taken of the rear of one of the row houses in the 600 block of North Locust Street with the heading "they call it Potlikker Flats" and wrote an accompanying article in which he falsely stated that the houses in the 600 block rent "for $40 and $45 *a week.*" (Emphasis supplied.) It is conceded that such an amount of rent for any of these properties would be grossly excessive and unheard of in Hagerstown. Inasmuch as the Harnish property is singled out, together with the photograph, it is made to appear that Dr. Harnish was charging this outrageous rental and was indeed "grinding the faces of the poor."

Ebersole, however, had actual knowledge that the tenants in Dr. Harnish's property only paid $40 *a month*— not *a week*—in that *on the previous day* he had published an article in The Morning Herald in which he stated that the rent was "40 a month." On cross-examination, Ebersole admitted that the statement in regard to $40 or $45 a week rent was incorrect. These admissions by the reporter could have been found by the jury to constitute actual knowledge of falsity and this is an important distinction of the instant case from the Court's decision in *A. S. Abell Co. v. Barnes,* 258 Md. 56, 265 A. 2d 207 (1970) in which the reporter never admitted that he had knowledge of the false accusation and stoutly

---

2. Also admitted into evidence by the trial court on the issue of malice of the reporter.

maintained that its publication was the result of an inadvertent mistake.

It is a rare case, indeed, in which the evidence could support a jury finding that the reporter admitted that he knew that the defamatory material was false, but nevertheless proceeded to publish such false material. This, however, is such a case and most certainly this case should have gone to the jury on this issue, even if one assumes that the trial court was not required to direct a verdict for Dr. Harnish on the question of liability.

(b) *Reckless disregard of truth or falsity.*

Not only did Ebersole have actual knowledge of falsity, as above set forth, but in many instances, the jury might well have found that he manifested a reckless disregard of the truth or falsity of defamatory and damaging material.

As already observed, Ebersole knew that the name of the veteran in the hospital at Bethesda was *Dennis* Reeder and not *James* Reeder. He had previously conferred with *Elmer* Reeder, the father and the tenant in the Harnish property. He had been in prior communication by telephone with Dr. Harnish. He received a xerox copy of the thirty-day notice to quit the premises from Nye. Under these circumstances, the jury could have concluded that the reporter entertained serious doubts of its truth or falsity and there was a reckless disregard of truth or falsity to equate the giving of the thirty-day notice to "the wounded Marine" without so much as a communication of any kind with Dr. Harnish or with Elmer Reeder prior to publication to ascertain whether or not this damaging statement were true or false. Even a limited knowledge would suggest that it was incredible that a thirty-day notice to quit a property would be given to an *absent son of a tenant,* rather than to the tenant himself, and at an address where it was known that the son was not present. The news was not "hot news" and

Ebersole had ample time to check the truth or falsity with Dr. Harnish or Elmer Reeder, the tenant.

Then, too, the thirty-day notice showed on its face that the Reeder family was not "evicted" as the glaring headline indicated. Indeed, as above indicated, the Reeder family remained in the Harnish property until the *City of Hagerstown* was ready to begin its demolition in order to widen Locust Street some months later, which Ebersole admitted he knew.

It should be remembered also that Ebersole admitted in his testimony that he had learned at a Rotary Club meeting in February, 1967, at which the Mayor of Hagerstown had spoken, that the City of Hagerstown intended to widen Locust Street in the 600 block and tear down those properties. Ebersole then knew that whatever violations of the building code existed in the 600 block Locust Street houses, the situation was likely to be a temporary one in the light of the contemplated demolition of the houses by the City. This presented a most unlikely area for the Ebersole-Nye "crusade" against Dr. Harnish, even assuming that Ebersole had an interest in proper housing generally in Hagerstown. The extraordinary activities of Nye, his visits to the veterans organizations in regard to the Harnish property, the great playing up of a really nonexistent veteran's problem, the singling out of the Harnish property—admittedly in better condition than many of the other houses in the 600 block of Locust Street—could lead a jury to conclude that Ebersole had indeed engaged in an "extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Curtis Publishing Co., supra,* 388 U. S. at 158, 87 S. Ct. at 1991, 18 L.Ed.2d at 1111.

The defendants below called Joseph M. Harp, Associate Editor of The Morning Herald and The Daily Mail as their witness. In reply to a question by the court, Mr. Harp stated that: "I haven't given Mr. Philip Ebersole any specific instructions. He is a veteran reporter and certainly knows he is to report only facts." On cross-

examination, Mr. Harp testified that, although he was a member of the American Society of Newspaper Editors and of the Annual Yearbook Committee, he was "not familiar with the Code of Ethics of the American Society of Newspaper Editors." Mr. Harp admitted on cross-examination that he had seen a book edited and published in pamphlet form by the American Newspaper Publishers Foundation, entitled A. Hanson, *Libel and Related Torts* (1969). At Section 299, page 245, the following appears:

> "D. CONCLUSION. The persistent use of formalized procedures and policies designed to promote accuracy is the best evidence the media can produce to show that publication was not in reckless disregard of the truth. Such procedures counteract any evidence of possible suspicions that the material was inaccurate. In the *New York Times* case for instance, it was shown that the persons handling the faulty advertisement saw nothing on its face which made it unacceptable under the 'Advertising Acceptability Standards' which the Times set forth in booklet form.
>
> "The absence of such systematic procedures renders the media vulnerable to a jury determination that a 'high degree of awareness of probable falsity' existed, and in addition intensifies the risks of the even stricter liability which attaches to misstatements about persons who are not public men."

The jury could have concluded that, notwithstanding this recommendation for the establishment of formalized, systematic procedures and policies by the newspaper to promote accuracy, Ebersole had no specific instructions and was, in effect, "left on his own" so far as the preparation of news articles was concerned with a consequent "extreme departure from the standard of investigation and reporting ordinarily adhered to by responsible publishers."

There are rulings on evidence and other rulings by the trial court which appear to me to have been in error, but it would unduly prolong this dissenting opinion to consider them specifically.

I would reverse and remand for a new trial. I am authorized to state that Judge Finan concurs in the views herein expressed.